## MAGNOLIA PETROLEUM CO. v. BREWER et al.

No. 21924. Opinion Filed May 5, 1931.

B. B. Blakeney, Hubert Ambrister, and W. R. Wallace, for the petitioner.

Leo J. Williams and M. J. Parmenter, for the respondents.

KORNEGAY, J. This is an original proceeding to review an award of the Industrial Commission, brought by the petitioner. Award was made October 23, 1930. There was not much dispute about the facts. While in the employ of petitioner, claimant, Fletcher Brewer, was "blowing down gauge column on boiler. Gauge glass blew out." "Glass blew in right eye."

Dr. Walker was the first medical attendant. As described by him, the injury was "gash through cornea and iris, glass probably in posterior chamber." Treatment was "atropine" in eye, dressing, referred to Drs. Ferguson and Wails, Oklahoma City, Okla. The inquiry blank as to other ailments was negative.

The employee's statement, received July 14, 1930, by the Commission, in describing the accident says, "water glass on boiler busted." "Put claimant's eye out." A hearing was ordered and had September 22, 1930. Dr. Mussil testified for claimant, and claimant testified for himself. This doctor was an eye, ear, nose, and throat specialist. The petitioner's attorney very closely cross-ex-

amined him. This doctor examined the injured man twice, one time August 21st, and another September 22nd. The right eye was out and gone. The left eye had 12 per cent. loss in vision. His testimony tended to show that the left eye's condition resulted from the injury to the right eye. He was interrogated about astigmatism, pathology, sympathetic irritation, and ophthalmia. The court inquired of him as to the progress of the irritation and the reason for removing an affected eye. He was cross-examined as to symptoms, objective and subjective.

The claimant testified and told about the injury, and his hospital experience, and his left eye's redness and hurting him while in the hospital, and that it was still bothering him, and that he was 36 years old, and the glasses Dr. Wails prescribed, and his inability to read over five minutes at a time, and the letters running together, and never being bothered before, and about his inability to tell anything about a bank in front of him, and his being "apt to lunge on anything." At this stage the claimant rested and the petitioner introduced its testimony.

It consisted of Drs. Westfall and Wails. Dr. Westfall examined plaintiff June 5th. The accident happened April 8th. At that time the loss of vision was 5 per cent. He did not examine for astigmatism. When he examined him, he was "suffering from the disability as a result of the injury as stated on April 9, 1930." As the examination proceeded, his opinion became positive that the loss of vision in the left eye was not by reason of the loss of the other eye, and upon being asked what was ophthalmia, he stated that it was difficult to answer. The court said a young man had answered that a while ago. Then followed questions by the Commission, and a reference to Fox, whom the doctor was acquainted with, and whose book he read from, containing a great many scientific terms, mostly derived from the Greek language, and "Greek" to the ordinary man.

Dr. Wails testified about attending the injured man and removing the right eye, and told about the expressions of the injured man concerning the condition of the left eye while in the hospital. He said, "I know we had the right eye tied up most of the time, and I don't recall that he complained of any one thing very much." June 4, 1930, was the last time he examined the eye. The question, page 22 of the record, and answer were as follows:

"Q. Doctor, being familiar with the history of this case, and having waited on this patient, as you stated, in your estimation, has he ever suffered any loss of vision in

the left eye on account of injury to the right eye? A. His vision when we last examined him, he admitted 20/30 clearly, and he had a little astigmatism at that time, as found by the refractive examination, but he admitted he could not see any better when the glass correcting that astigmatism was placed before his eye, and at our last examination, and every other examination, we never saw any objective changes; that is, he had no reddened-up, inflamed eye, no exudation or sign of inflammation about the eye. The first one was removed because it was irreparably blind, painful and a useless eye, keeping him from work, and no possible chance of getting any vision, and which showed a yellowish exudation which we interpreted as being ophthalmia, which became more or less dangerous to that eye,— not necessarily to the other, or as far as the left eye is concerned, and his first eye was removed, because it began to show what we term pus in that eye, but it had a punctured wound, and not because of trouble in the other eye; that is a thing we figured would at least stop anything which might show a tendency to appear in the other eye; that is, if there was anything showing in the other eye, then removal of the first eye would stop it. Q. There was nothing to indicate it was being infected? A. No, sir; no injection or spasm: he complained of the light hurting his eye. Q. Do they complain of that when the eye is not affected? A. I think in time, one gets vision centered in one eye, and light bothers the other eye, and that causes a sympathetic irritation to set up in the other eye."

The remainder of this examination was on the same line. He read from Fox, and translated the medical terms into common language. His test of vision in left eye was after he left the hospital—"We didn't have any charts out at the hospital." He strongly combatted the idea of sympathetic irritation. He told of the glasses, and about eye-strain, farsightedness, measles and typhoid, resistance lowering, etc. The court interrogated him about testimony in other cases. The attorney for the petitioner tried to find a cause for the left eye's condition by questioning claimant about a burn about the ear and neck, but the burn was 12 years old. Complaint is here made of the findings of the Commission as to the impairment to the left eye and its cause.

Numerous citations are made about the necessity for "men of science" to pass upon matters connected with accidental injuries, and the Industrial Commission gauging its award accordingly. From the course of the examination, it appears that Dr. Wails had testified in other matters before the Commission. The question before the Commission was the amount of defect in the vision of the left eye and its cause. The claimant was 36 years old, and had never had eye trouble of any kind. The medical examiner's report showed negative as to those things that we ordinarily look to when searching for systemic defects. An eye specialist testified and gave testimony tending to show the causes of defective vision to be the injury to the right eye. Taking the symptoms complained of by the claimant, when examined by the doctors, and it is reported that there was no evidence of malingering, those things are shown that would probably lead to loss of vision. Taking the examinations of August 21st and September 21st, showing 12 per cent. loss, would indicate the trouble to be progressive.

The Commission was justified in making the finding it did make. It could have figured 12 per cent. loss instead of 5 per cent. and increased the award. Its method of calculation does not appear to be complained of. The case should be affirmed. There appears a supersedeas bond. The award is sustained, and the Industrial Commission is ordered to proceed with its enforcement.

RILEY, HEFNER, CULLISON, SWINDALL, ANDREWS, and McNEILL, JJ., concur. LESTER, C. J., and CLARK, V. C. J., absent.